# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANTANDER BANK, N.A., | : | Civil No. 1:17-CV-01669 |
| Plaintiff, | : | |
| v. | : | |
| BRANCH BANKING & TRUST CO., | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This is an action under Pennsylvania's Uniform Fraudulent Transfer Act ("PUFTA"). Plaintiff, Santander Bank, N.A. ("Santander") seeks to avoid a transfer of more than sixteen million dollars that was made to Graystone Bank ("Graystone"), a predecessor of the defendant, Branch Banking & Trust Co. ("BB&T"). The case is presently before the court on a motion for summary judgment filed by BB&T, in which BB&T argues that Santander's claim is extinguished by PUFTA's statute of limitations, and that BB&T should prevail under PUFTA's good faith affirmative defense. For the reasons that follow, the court concludes that there are genuine issues of material fact that preclude the entry of summary judgment. Accordingly, BB&T's motion for summary judgment will be denied.

## Factual Background

The transfer at issue in this case arises from the business dealings of a company called Gaver Technologies, Inc. ("GTI"), which was founded in 1998 by Mark Gaver ("Gaver"), the company's sole shareholder and sole director. During the period relevant to this case, GTI first maintained a banking relationship with Graystone[1] and then moved its banking activities to Santander.[2]

After many years of GTI maintaining a banking relationship with Santander, Santander realized that GTI's financial records were fraudulent. This led to Gaver being criminally convicted of bank fraud and money laundering for which he was sentenced to seventeen years in prison. Gaver was also ordered to pay a civil judgment to Santander of $49.4 million.

Santander's fraudulent transfer claim against BB&T centers on a $16,167,624.00 transfer ("the transfer") made from Santander to Graystone on GTI's behalf shortly after GTI transferred its banking activities from one bank to the other. Because much of the claim depends on what each bank knew at the time it maintained a relationship with GTI, this section will address the facts relating to

---

[1] Through successive mergers, Graystone became BB&T. (Doc. 48 ¶ 1; Doc. 56 at 3.)
[2] At the time GTI began its relationship with Santander, Santander was known as Sovereign Bank; the bank changed its name to Santander Bank in October 2013. (Doc. 12 ¶ 6.) For convenience, the court will refer to the bank as "Santander" throughout this opinion, regardless of whether the reference is to the bank before or after the name change.

GTI's relationship with Graystone before addressing the facts relating to GTI's relationship with Santander.

**A. GTI's Relationship with Graystone**

GTI began its banking relationship with Graystone in 2007. (Doc. 12 ¶ 14; Doc. 21 ¶ 14.) As part of the relationship, Graystone gave GTI a $12 million line of credit on April 12, 2007. (Doc. 48 ¶ 4; Doc. 56 at 3.) This line of credit was based in part on GTI documents that Gaver had submitted to Graystone, including financial statements for the years 2004 and 2005 that had purportedly been audited by an outside firm, internal financial statements for the years 2004 through 2006 and part of 2007, an aging of GTI's accounts receivable, a credit bureau report for GTI, and tax returns for Gaver and his wife. (Doc. 48 ¶9; Doc. 56 at 3.) Graystone subsequently increased the value of GTI's line of credit several times, resulting in a $16 million line of credit on September 9, 2008. (Doc. 48 ¶ 14; Doc. 56 at 3.) GTI continued to submit documentation of its financial position to Graystone during this period. (Doc. 48 ¶¶ 10, 192; Doc. 56 ¶¶ 10, 192.)

In connection with its line of credit with Graystone, GTI was required to make monthly payments to Graystone. (Doc. 12 ¶ 22.)[3] GTI missed the payment

---

[3] In its answer to Paragraph 22 of Santander's amended complaint, BB&T asserts that it is "without knowledge or information sufficient to form a belief with respect to the allegations in paragraph 22 of the Complaint." (Doc. 21 ¶ 22.) A party answering a complaint "may not deny sufficient information or knowledge with impunity." *Kegerise v. Susquehanna Twp. Sch. Dist.*, 321 F.R.D. 121, 125 (M.D. Pa. 2016) (quoting *David v. Crompton & Knowles Corp.*, 58 F.R.D.

3

it was required to make in June 2009. (*Id.*) Gaver explained in an email to Graystone that GTI was unable to make the payment because it needed the money to meet its payroll obligations. (*Id.*)

On April 14, 2009, Gaver requested another increase in the value of GTI's line of credit, but Graystone informed him that it did not have sufficient capital to provide such an increase. (Doc. 48 ¶ 17; Doc. 56 at 3.) This prompted Gaver to look into moving GTI's line of credit to another bank. (Doc. 48 ¶ 18; Doc. 56 at 3.) Gaver then began negotiating with Michael Postupak ("Postupak"), a Vice President at Santander. (*Id.*)

### B. GTI's Relationship with Santander

Gaver began negotiating with Postupak in 2009. (*Id.*) During these negotiations, Gaver provided Santander financial statements for the years 2004 through 2008 that were purportedly audited by accounting firm Grant Thornton, LLP. (Doc. 12 ¶ 16.) The financial statements showed that GTI was a financially successful company with strong growth. (*Id.*) The statements also contained

---

444, 446 (E.D. Pa. 1973)). "An averment will be deemed admitted when the matter is obviously one as to which defendant has knowledge or information." *Id.* (quoting *David*, 58 F.R.D. at 446). Furthermore, a party has a duty to exert reasonable effort to obtain knowledge of a fact. *Id.* (citing *Greenbaum v. United States*, 360 F. Supp. 784, 787 (E.D. Pa. 1973)). Here, Paragraph 22 of the amended complaint alleges facts pertaining to an agreement between GTI and Graystone. BB&T, as the successor to Graystone, clearly had sufficient information to answer those factual allegations after a reasonable investigation. Santander's allegations in paragraph 22 are therefore deemed admitted.

several irregularities, including fonts for the accounts receivable agings and contract status reports that differed from the fonts used in the rest of the reports; incorrect dates; references to sections that did not exist anywhere in the reports; and dollar amounts that did not match up with other GTI documentation during the same period. (Doc. 48 ¶¶ 22–32; Doc. 56 ¶ 22–32.) In addition to the financial reports, Gaver also submitted tax returns and personal financial statements for him and his wife. (Doc. 48 ¶ 19; Doc. 56 ¶ 19.)

Based in part on the financial statements and other documents that Gaver provided, Santander approved an $18.5 million line of credit for GTI. (*Id.* ¶ 20.) Through that line of credit, GTI borrowed $16,167,624.00 from Santander, which it used to pay off its outstanding debt to Graystone. (Doc. 48 ¶ 49; Doc. 56 ¶ 49.) The $16,167,624.00 was transmitted from Santander to Graystone via wire transfer. (*Id.*)

Following its initial approval of the $18.5 million line of credit, Santander agreed to increase the value of GTI's line of credit several times, resulting in an eventual value for the line of credit of $50 million. (Doc. 48 ¶ 176; Doc. 56 ¶ 176.) These increases were based in part on financial statements showing that GTI continued to grow at a fast pace and had a strong financial position. (Doc. 12 ¶ 23; Doc. 48 ¶¶ 68, 79, 99, 101, 112, 136; Doc. 56 ¶¶ 68, 79, 99, 101, 112, 136.) Like the initial financial statements Gaver submitted, however, these statements

5

contained several irregularities, including a discrepancy in one statement of almost $5 million between the value of GTI's accounts receivable and its total assets. (Doc. 48 ¶ 70; Doc. 56 ¶ 70.) Another statement contained a date that was off by seven months and amounts that were completely identical from one year to the next. (Doc. 48 ¶ 141; Doc. 56 ¶ 141.)

GTI's agreement with Santander required the company to maintain most of its deposit accounts and deposits with Santander. (Doc. 48 ¶ 51; Doc. 56 ¶ 51.) Accordingly, GTI maintained a deposit account with Santander, Account 3553. (Doc. 48 ¶ 53; Doc. 56 ¶ 53.) Despite the requirement that GTI maintain most of its deposits with Santander, there were substantial stretches of time in which GTI's only significant deposits into Account 3553 were advances through GTI's line of credit with Santander. (*See* Doc. 48 ¶ 56; Doc. 56 ¶ 53; Doc. 48 ¶ 63; Doc. 56 ¶ 63.) For example, from August 27, 2009, to January 2010, GTI made only one $450 deposit into Account 3553 that was not an advance on its line of credit. (Doc. 48 ¶ 56; Doc. 56 ¶ 53.) In addition to this lack of deposits in Account 3553, GTI over-drafted the account on multiple occasions. (Doc. 48 ¶¶ 86, 109; Doc. 56 ¶¶ 86, 109.)

In addition to the lack of activity in Account 3553, there were multiple occasions during GTI's relationship with Santander in which GTI struggled to repay its loans from the bank. On February 24, 2010, for example, credit

6

professional Joseph Sigle advised Postupak that GTI's financial records suggested that the company was going to default on a portion of its loan agreement with Santander. (Doc. 48 ¶ 57; Doc. 56 ¶ 57.) The next month, Gaver told Postupak that GTI's loan payment to Santander would bounce unless the value of GTI's line of credit was increased immediately. (Doc. 48 ¶ 58; Doc. 56 ¶ 58.) Santander agreed to increase GTI's line of credit at that time. (Doc. 48 ¶ 59; Doc. 56 ¶ 59.)

At one point during GTI's relationship with Santander, the company submitted a balance sheet showing that the company had $6.9 million in cash on hand, an amount that Postupak noted was "contrary to every balance sheet [he had] seen for [the] company since 2009." (Doc. 48 ¶ 152; Doc. 56 ¶ 152.) Postupak emailed Gaver to inquire about the discrepancy, noting that such a large amount of cash on hand was "atypical for GTI." (Doc. 48 ¶ 155; Doc. 56 ¶ 155.) Gaver explained that the discrepancy was "just an anomaly" regarding the timing of payments to the company. (Doc. 48 ¶ 156; Doc. 56 ¶ 156.) Postupak and two other Santander employees failed to investigate this explanation further, even though an investigation would have shown that GTI's cash on hand at the relevant time actually totaled less than $450,000. (Doc. 48 ¶¶ 158–59; Doc. 56 ¶¶ 158–59.)

During the period in which GTI maintained a banking relationship with Santander, Santander allowed GTI to depart from the bank's regular policies on multiple occasions. For example, Santander's policies required a field examination

7

to be performed on GTI's records before Santander could make any advance to GTI. (Doc. 48 ¶ 38; Doc. 56 ¶ 38.) Santander agreed to waive this requirement for GTI because of Santander's belief that GTI was being regularly audited by the United States Department of Defense. (Doc. 48 ¶ 39; Doc. 56 ¶ 39.) Santander, however, never obtained a copy of any Department of Defense audit or confirmed in any other way that the Department of Defense audits were being performed. (Doc. 48 ¶ 40; Doc. 56 ¶ 40.) Similarly, Santander's policies required GTI to submit its annual federal tax returns, but Santander never obtained any such returns from GTI. (Doc. 48 ¶¶ 72–73; Doc. 56 ¶¶ 72–73.)

On one occasion, Santander asked to perform a field examination of GTI's records, despite its earlier waiver of such examinations. (Doc. 48 ¶ 110; Doc. 56 ¶ 110.) Gaver told Santander that the government had told him field examinations could only be performed by entities that were "void of foreign interests," which therefore precluded Santander from performing such an audit since Santander was a subsidiary of a Spanish bank.[4] (Doc. 48 ¶ 111; Doc. 56 ¶ 111.)

Santander eventually learned that Gaver had defrauded the bank and that GTI's financial statements had been forged. (Doc. 48 ¶ 185; Doc. 56 ¶ 185.) The forged financial statements suggested that GTI was in a significantly stronger

---

[4] "Santander is an indirect subsidiary of Banco Santander, S.A., an international bank based in Spain." Doc. 12 ¶ 6.

8

financial position than it actually was. (Doc. 12 ¶ 18.) While the financial statements suggested that GTI had significant assets and was experiencing strong growth, in reality, GTI was insolvent during the entire period it maintained a relationship with Santander. (*Id.* ¶ 19.)

Based on his fraud, Gaver was tried and convicted for ten counts of bank fraud and money laundering in the United States District Court for the District of Maryland and sentenced to seventeen years in prison. (Doc. 61-19.) Santander subsequently obtained a civil judgment against Gaver in the Dauphin County Court of Common Pleas in Pennsylvania state court for $49.4 million. (Doc. 12 ¶ 29; Doc. 21 ¶ 29.)

## PROCEDURAL HISTORY

Santander filed the instant suit seeking to avoid the transfer under PUFTA,[5] asserting that Graystone was aware of GTI's insolvency at the time of the transfer but "intentionally and knowingly disregarded GTI's insolvency to ensure [its] loan was paid off in full." (Doc. 12 ¶ 33.) On February 5, 2018, United States District Judge Yvette Kane denied BB&T's motion to dismiss, finding that dismissal under

---

[5] Effective February 2018, PUFTA was amended and renamed the Uniform Voidable Transactions Act. *See* 12 Pa.C.S. § 5101; *In re Titus*, 916 F.3d 293, 299 n.3 (3d Cir. 2019). Because this case was filed before that change, the court will refer to the statute as PUFTA throughout this opinion.

9

PUFTA's statute of limitations was not warranted. (Doc. 20.) BB&T then filed an answer on February 23, 2018. (Doc. 21.)

BB&T filed the instant motion for summary judgment on May 31, 2019, along with a supporting brief and a statement of facts. (Docs. 46–48.) Santander opposed the motion and filed a response to BB&T's statement of facts on June 28, 2019. (Docs. 56–57.) BB&T filed a reply brief on July 19, 2019, and the parties then filed two additional sur replies after obtaining leave of the court to do so. (Docs. 64, 69, 73.) On November 19, 2019, the case was reassigned from Judge Kane to the undersigned pursuant to a verbal order from Chief United States District Judge Christopher C. Conner.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1332, which allows a district court to exercise subject matter jurisdiction where the parties are citizens of different states and the amount in controversy exceeds $75,000.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is

not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or

11

denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

In its motion, BB&T raises two arguments as to why it is entitled to summary judgment. First, BB&T argues it is entitled to summary judgment because Santander's claim under PUFTA is extinguished by operation of PUFTA's statute of limitations, 12 Pa.C.S. § 5109. Second, BB&T argues it is entitled to summary judgment by virtue of the good faith affirmative defense under PUFTA

because Graystone took the transfer in good faith and for a reasonably equivalent value. These arguments will be considered seriatim.

### A. The Statute of Limitations Does Not Entitle BB&T to Summary Judgment[6]

Under PUFTA's statute of limitations, a claim to avoid a transfer is extinguished unless it is brought "not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant." 12 Pa.C.S. § 5109. Under Pennsylvania's discovery rule, the statute of limitations is tolled when "a plaintiff, 'despite the exercise of due diligence, is unable to know of the existence of the injury and its cause.'" *State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301, 306 (E.D. Pa. 2011) (quoting *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991)). The applicable limitations period accordingly starts to run when the plaintiff discovers "the alleged fraudulent nature of the transfer at issue." *Santander Bank, N.A. v. Branch Banking & Tr. Co.*, No. 1:17-CV-01669, 2018 WL 8368857, at *3 (M.D. Pa. Feb. 5, 2018) (Kane, J.).

---

[6] Although Judge Kane previously considered whether Santander's claim was extinguished by PUFTA's statute of limitations in denying BB&T's motion to dismiss, *see Santander Bank, N.A. v. Branch Banking & Tr. Co.*, No. 1:17-CV-01669, 2018 WL 8368857 (M.D. Pa. Feb. 5, 2018), that opinion does not constitute law of the case here because it was based on a motion to dismiss while the present opinion considers a motion for summary judgment. *See Wiest v. Tyco Elec. Corp.*, 812 F.3d 319, 329–30 (3d Cir. 2016) (holding that because the threshold necessary to survive a motion to dismiss is lower than that necessary to survive a motion for summary judgment, opinions addressing motions to dismiss do not constitute law of the case for opinions addressing motions for summary judgment).

To determine the point at which the limitations period under PUFTA is triggered, a court must determine the point when the plaintiff knew or reasonably should have known that it was injured and that its injury was caused by another's conduct. *State Farm*, 834 F. Supp. 2d at 306 (quoting *Oshiver v. Levin*, 38 F.3d 1380, 1386 (3d Cir. 1994)). "The relevant inquiry then is not plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise of diligence, knowable to the plaintiff." *Id.* (quoting *Bohus*, 950 F.2d at 925).

The point in time at which a plaintiff knew or should have known about an injury is "generally an issue of fact to be determined by the jury." *Knopick v. Connelly*, 639 F.3d 600, 611 (3d Cir. 2011) (quoting *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 307 (3d Cir. 2001)); *see also Kirksey v. Ross*, 372 F. Supp. 3d 256, 262 (E.D. Pa. 2019) ("Whether or not Pennsylvania's discovery rule applies in a given case is a question of fact."). A court should only determine whether the discovery rule applies as a matter of law "where the facts are so clear that reasonable minds cannot differ." *Id.* (quoting *Coregis*, 264 F.3d at 307).

In this case, BB&T argues that Santander's claim is distinguished by operation of the statute of limitations because "no reasonable fact finder could conclude based on the evidence adduced during discovery in this case that Santander should not have reasonably discovered GTI's fraud before September 15, 2016." (Doc. 47 at 43.) BB&T points to numerous red flags that Santander

"claims not to have noticed" regarding its relationship with GTI, which, according to BB&T, show that Santander should have known about Gaver's fraud long before Santander had actual knowledge of the fraud. (*Id.* at 14–39.) Santander argues in response that "ample evidence" supports the contention that a reasonably diligent banker in Santander's position would not have discovered the fraud before Santander actually did so. (Doc. 57 at 16.)

The court finds that there are genuine issues of material fact that preclude the entry of summary judgment. BB&T has introduced evidence to show that Santander should have known about Gaver's fraud long before it had actual knowledge of the fraud, while Santander has introduced evidence to show that a reasonable banker would not have discovered the fraud any earlier than Santander did. Given the competing evidence, the court finds that reasonable fact finders could differ as to the point at which Santander knew or should have known about Gaver's fraud. There is, therefore, a question of fact that the court cannot determine at this stage of litigation. *See, e.g.*, *Knopick*, 639 F.3d at 611. The court will accordingly deny BB&T's first argument for summary judgment.

### B. The Good Faith Affirmative Defense Does Not Entitle BB&T to Summary Judgment

BB&T's second argument for summary judgment is that it is entitled to summary judgment by virtue of the good faith affirmative defense under PUFTA

15

because Graystone took the transfer in good faith and for a reasonably equivalent value.

Creditors may avoid transfers under PUFTA if three conditions are met: "(1) the plaintiffs are 'creditors' as defined by the statute; (2) the transfers were made with actual fraudulent intent; and (3) there are no viable defenses." *Carroll v. Stettler*, 941 F. Supp. 2d 572, 578 (E.D. Pa. 2013) (citing 12 Pa.C.S. §§ 5104, 5107, 5108).

One of the defenses that allows a transferee to defeat a claim for avoidance of a transfer under PUFTA is what is known as the "good faith" affirmative defense. *Id.* at 579. To prevail on the defense, the transferee must establish that (1) it took the transfer in good faith and (2) that it took the transfer for a reasonably equivalent value. *Id.* at 579 (citing 12 Pa.C.S. § 5108). The transferee bears the burden of proof to establish the defense. *Image Masters, Inc. v. Chase Home Finance*, 489 B.R. 375, 391 (E.D. Pa. 2013) (citing *In re Lockwood Auto Grp., Inc.*, 428 B.R. 629, 636 (W.D. Pa. 2010)).

The question of whether a transferee acted in good faith depends on whether it had "sufficient knowledge to place [it] on inquiry notice of the voidability of the transfer." *Carroll*, 941 F. Supp. 2d at 579 (quoting *Hecht v. Malvern Prep. Sch.*, 716 F. Supp. 2d 395, 401 (E.D. Pa. 2010)). Courts performing this analysis "look to what the transferee objectively knew or should have known concerning the

nature of the underlying circumstances involved with the transfer." *Lockwood*, 428 B.R. at 636. In analyzing what the transferee knew or should have known, a court will typically assess whether the transferee "ignored 'red flags' revealing the true nature" of the transfer. *Hecht*, 716 F. Supp. 2d at 401 (quoting *In re Burry*, 309 B.R. 130, 135 (E.D. Pa. 2004)). Relevant factors in determining whether a transferee had sufficient knowledge to place it on inquiry notice of the voidability of a transfer include the transferee's financial sophistication, the number and nature of red flags the transferee was aware of, and whether the amount of money the transferee received as a result of the transfer deterred it from investigating the transfer. *Carroll*, 941 F. Supp. 2d at 579 (citing *SEC v. Forte*, No. 09-CV-00063, 2012 WL 1719145, at *6 (E.D. Pa. May 16, 2012)).

The good faith defense is not automatically established by a transferee's lack of actual knowledge that a fraud was being perpetrated. *Image Masters*, 489 B.R. at 391 (citing *Lockwood*, 428 B.R. at 636). "Where a transferee is on notice of suspicious circumstances regarding a transfer, 'it is obliged to conduct a diligent investigation which must ameliorate the issues that placed it on inquiry notice in the first place' or it may lose the benefit of the 'good faith' defense." *Id.* (quoting *Lockwood*, 428 B.R. at 636).

The question of whether a transferee knew or should have known that a fraud was being perpetrated is generally a question of fact. *See, e.g.*, *Carroll*, 941

17

F. Supp. 2d at 579 (finding that question of fact as to defendants' knowledge of transferor's fraud precluded the entry of summary judgment); *Hecht*, 716 F. Supp. 2d at 401–02 (finding that there was a question of fact as to whether transferees should have known that a transfer was too good to be true).

In this case, BB&T argues it is entitled to summary judgment based on the good faith defense. BB&T bases this argument on a syllogism arising from Santander's argument that it should not have discovered Gaver's fraud any earlier than it did. According to BB&T's reasoning, if the court credits Santander's argument that it should not have discovered Gaver's fraud any earlier, then it "cannot credibly [be] dispute[d] that Graystone should not have reasonably discovered GTI's fraud during the much shorter two year and four month period between April 12, 2007 and August 27, 2009 when Graystone was GTI's lender." (Doc. 47 at 41.) "If Santander should not have reasonably discovered GTI's fraud during the seven-year period between August 27, 2009 and September 15, 2016, then Graystone should not have reasonably discovered GTI's fraud during the two year and four-month period between April 12, 2007 and August 27, 2009." (*Id.* at 42.)

Santander argues it has introduced evidence to show that Graystone did not act in good faith and that issues of fact therefore preclude summary judgment in BB&T's favor. (Doc. 57 at 39–44.) Most notably, Santander asserts that a lack of

18

activity in GTI's accounts with Graystone and GTI's repeated difficulties in making payments to Graystone should have alerted Graystone to a potential issue with GTI. (*Id.*) Santander notes that despite these warning signs, Graystone did not conduct any investigation into GTI's financial situation. (*Id.* at 43.)

In reply, BB&T reiterates its argument that if Santander should not have discovered Gaver's fraud during its seven-year relationship with GTI, it follows that Graystone also should not have discovered Gaver's fraud during its shorter relationship with GTI. (Doc. 64 at 2–4.) Essentially, BB&T argues, if Gaver's fraud was as undetectable as Santander asserts, then there is no basis to argue that Graystone should have discovered the fraud during its earlier relationship with GTI. (*Id.* at 4–5.) BB&T then reiterates that Graystone did not have actual or constructive knowledge of Gaver's fraud and that it therefore acted in good faith. (*Id.* at 5–11.) The parties reinforce these arguments in their sur replies: Santander argues there is an issue of fact as to whether Graystone acted in good faith that precludes summary judgment, while BB&T argues that Graystone and Santander were on notice of the same circumstances and that a finding that Santander should not have discovered Gaver's fraud therefore necessarily precludes a finding that Graystone should have discovered the fraud. (*See generally* Docs. 69, 73.)

The court finds there are material issues of fact that preclude the entry of summary judgment. Santander has introduced evidence of the circumstances

19

surrounding Graystone's relationship with GTI to establish a factual issue of whether Graystone knew or should have known of the fraudulent nature of the transfer.  While the court acknowledges BB&T's argument that if Santander should not have discovered Gaver's fraud, then it follows that Graystone also should not have discovered the fraud, it is simply not the court's place at this stage of litigation to make such a factual conclusion.  There are disputed questions of fact as to the material fact of whether Graystone acted in good faith which cannot properly be resolved at the summary judgment stage.  The court will accordingly deny BB&T's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, BB&T's motion for summary judgment is denied. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: January 3, 2020